## AFFIDAVIT IN SUPPORT OF FORFEITURE

**Jennifer W. Joiner**, being first duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and states as follows:

## PROPERTY SUBJECT TO FORFEITURE

1.     This affidavit is being submitted to establish probable cause in support of a Verified Complaint for Forfeiture in Rem for the following two real properties:

Defendant Real Property located at 5 Portofino Drive #1006, Pensacola Beach, Escambia County, Florida, Property Tax ID # 282S261000667003 ("the Portofino Property"), titled in the name of "The JSSK Family Trust Dated October 7, 2014," more particularly described as:

> **Unit 1006 of Portofino Tower Five, a Condominium, along with the exclusive right to the use of certain limited common elements known as Parking Spaces 167 and 169 and Storage Area 81, according to the Declaration of Condominium thereof recorded in Official Records Book 5874, page 871, of the Public Records of Escambia County, Florida and all amendments thereto, together with its undivided share in the common elements.**

Defendant Real Property located at 2001 High Street, Park City, Summit County, Utah, Parcel # CCRS-1-15 ("the Canyon Crossing Property"), titled in

1

the name of "John Michael Thomas and Shana Sheppard Thomas as Trustees of the JSSK Family Trust dated October 7, 2014," more particularly described as:

> **Unit 15, CANYON CROSSING CONDOMINIUMS, PHASE I, a Utah Condominium Project, together with its appurtenant undivided ownership interest in and to the common areas and facilities, as established and described in the Record of Survey Map recorded December 16, 1998 as Entry No. 525308, and in the Declaration of Condominium of Canyon Crossing Condominiums recorded December 16, 1998 as Entry No. 525310, in Book 1211, at Page 602, of the Official Records of Summit County, Utah.**

2.      A search of the Summit County and Escambia County official records performed on or about January 26, 2021, did not locate any outstanding liens or mortgages against either real property.

3.      Based upon information contained in this affidavit, I respectfully submit that the Defendant Real Properties are subject to forfeiture to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 981(a)(1)(C), as property involved in transactions or that constitute proceeds or are derived from proceeds traceable to violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1956(a)(1) (Money Laundering), and 1957 (Money Laundering Involving Financial Transactions Exceeding $10,000).

## INTRODUCTION AND AGENT BACKGROUND

4.      I have been a Special Agent ("SA") with the FBI since 2005. I am currently assigned to a squad responsible for conducting investigations which typically pertain to violations of Title 18 of the United States Code, including, but not limited to, complex financial fraud, bank fraud, mail fraud and wire fraud violations and other white-collar crime matters.  I have a master's degree in taxation and have been a Certified Public Accountant since 2001.  In my tenure with the FBI, I have participated in the execution of search warrants and arrest warrants and have conducted investigations in the areas of corporate fraud, financial institution fraud, wire and mail fraud, as well as other white-collar crime matters.  During the course of these and other investigations I have conducted or participated in physical and electronic surveillance, debriefed informants, and reviewed pertinent records.  Through my training, education, and experience, I have become familiar generally with the efforts of persons involved in criminal activity to avoid detection by law enforcement.

5.      I am familiar with the facts and circumstances surrounding this investigation, both from my own investigative activities and from information obtained from law enforcement officers and others with personal knowledge of the facts.   I have not included all facts known to me concerning this

3

investigation, but rather only those facts necessary to establish support for forfeiture of the Defendant Real Properties.

## BACKGROUND

6.     An insurance agent is an independent businessperson who usually represents two or more insurance companies under contract in a sales and service capacity and who is paid on a commission basis.  An insurance contract is an agreement of an insurance company to provide benefits or reimburse losses in return for an amount of money known as a premium. A policy is the written statement of the insurance contract terms.

7.     Businesses often require many different types of insurance products, including but not limited to the following:

   A. Automobile liability insurance - Protection for the insured against financial loss because of legal liability for car-related injuries to others or damage to their property.

   B. Directors and Officers liability insurance - Coverage for directors and officers of firms or organizations against liability claims arising out of alleged errors in judgement, breaches of duty, and wrongful acts related to their organizational activities.

   C. Employment practices liability insurance (EPLI) - A type of management liability insurance that protects an employer against employees' claims that deal with wrongful termination, sexual harassment, discrimination, invasion of privacy, breach of contract, emotional distress, and wage and hour law violations.

D. Fire insurance - Coverage for losses caused by fire, lightning and the removal of property from endangered premises, plus resultant damages caused by smoke and water.

E. Flood insurance - Coverage against loss resulting from the flood peril.

F. General liability insurance – A form of coverage that pertains, for the most part, to claims arising out of the insured's liability for injuries or damage caused by ownership of property, manufacturing operations, contracting operations, sale or distribution of products, and the operation of elevators and the like, as well as services.

G. Product liability insurance - Insurance coverage for the liability for damages caused by accident arising out of goods or products manufactured, sold, handled, or distributed by the insured or others trading under the insured's name.

H. Property damage liability insurance - Insurance against financial losses growing out of a policyholder's liability for damage to the property of another including loss of the use of the property.

I. Umbrella liability insurance - A form of insurance protection against losses in excess of the amount covered by other liability insurance policies.  It also protects the insured in many situations not covered by the usual liability policies.

8.      A Certificate of Insurance is a statement issued by an insurer verifying a policy has been written and issued.  According to www.acord.org, the Association for Cooperative Operations Research and Development (ACORD) is the global standards-setting body for the insurance and related financial services industries. ACORD facilitates fast, accurate data exchange,

5

and efficient workflows through the development of electronic standards, standardized forms, and tools to support their use.  ACORD has provided the standard forms used by the insurance industry since 1972.

9.     An ACORD Certificate of Insurance summarizes the essential information about an insurance policy such as the coverage type, policy number, insurance limits, and effective and expiration dates.  A business owner may be asked to provide a lender, customer or vendor a copy of a Certificate of Insurance in order to show proof of insurance.

10.     The embezzlement of insurance premiums, also known as premium diversion, is a common type of insurance fraud.  In many cases, this type of fraud involves an insurance agent collecting premiums from the customer but failing to send the money to the insurance company that underwrites the policy. Instead, the insurance agent keeps the money for their own personal use.

## INVESTIGATION

11.     On January 5, 2021, I interviewed the President and Chief Executive Officer (CEO) (hereinafter referred to as "Executives") of a family-owned manufacturing business (hereinafter referred to as "Victim Company #1") located in Pensacola, Florida.  The Executives advised that Victim Company #1 had been the victim of an insurance fraud scheme perpetrated by

JOHN M. THOMAS (hereinafter referred to as THOMAS), owner and operator of THOMAS INSURANCE, LLC (hereinafter referred to as THOMAS INSURANCE).

12.     According to the Executives, they began using THOMAS INSURANCE for all their insurance products in or around October 2013. Since that time, Victim Company #1 has paid approximately $600,000 in insurance premiums to THOMAS INSURANCE, but has recently learned THOMAS did not purchase many of the insurance policies for Victim Company #1. Instead, THOMAS produced fraudulent Certificates of Insurance (COAs) which he provided to Victim Company #1 via email. Victim Company #1 purchased general liability, business automobile, business property, product liability, director and officer, employment practices liability, and flood insurance products from THOMAS INSURANCE.

13.     In December 2020, the Executives began hearing rumors from friends that something was going on with THOMAS INSURANCE. Two friends of the CEO of Victim Company #1 independently told him there had been an issue with one of THOMAS INSURANCE's clients, a hotel located in Pensacola Beach, Florida. The hotel had suffered damage due to a fire, and when the hotel filed an insurance claim, THOMAS INSURANCE had to write

7

a check for approximately $900,000 to settle the claim because there was no insurance policy in effect to pay the claim. Had THOMAS INSURANCE purchased the insurance policy with the premiums paid, the insurance company would have written the check to settle the claim instead of THOMAS INSURANCE.

14.    As a result of this information, the Executives became concerned about whether Victim Company #1 in fact held the insurance policies it had purchased with the premiums paid to THOMAS INSURANCE. The Executives began contacting the insurance companies directly to verify the policies listed on the COAs THOMAS had provided.

15.    The Executives contacted the insurance company listed on the COA THOMAS provided for the Directors and Officers insurance policy, and the insurance company representative told the Executives the policy number does not exist. In fact, the policy number listed by THOMAS was invalid based on the number of digits it contained. The representative from the insurance company was able to identify the insured business after the extra digit was removed, and the policy belonged to a cinema located in Gulf Breeze, Florida. Victim Company #1 paid approximately $6,600 in premiums for this policy between 2013 and 2020.

8

16.     According to the Executives, when they contacted the insurance company listed on their COA for Victim Company #1's business property insurance, the company advised they were unable to locate any policy in Victim Company #1's name.  The policy number THOMAS had listed on the COA appeared to match a quote number from 2013 when THOMAS originally received the quote for the policy.  Between 2015 and 2020, Victim Company #1 paid THOMAS INSURANCE approximately $269,000 in premiums for this policy.

17.     Victim Company #1 contacted the insurance company listed on the THOMAS INSURANCE COAs for their general liability and umbrella liability insurance policies.  Victim Company #1 is still awaiting the final confirmation from the insurance company listed, but the representative the Executives spoke with indicated the policy number listed also matched the same cinema located in Gulf Breeze, Florida.  Victim Company #1 paid THOMAS INSURANCE approximately $186,000 for insurance premiums related to these policies between 2014 and 2020.

18.     Victim Company #1 is also awaiting final confirmation from the insurance company listed on its EPLI COA, but the representative from that insurance company stated the policy number provided by THOMAS was issued

9

to a different company that is unrelated to Victim Company #1.  Between 2014 and 2020, Victim Company #1 paid THOMAS INSURANCE approximately $28,000 for the EPLI insurance premiums.

19.     Based on the information provided by Victim Company #1, I initiated an investigation of THOMAS INSURANCE in January 2021.  I performed a search on the website for the Division of Corporations for the State of Florida (www.sunbiz.org) and located the filing information for THOMAS INSURANCE LLC.  The Articles of Incorporation for the LLC were filed on or about May 28, 2004, and listed JOHN M. THOMAS as the registered agent and managing member.  As of February 15, 2021, THOMAS INSURANCE LLC still displayed as an active entity with a principal address of 1010 W. Garden Street, Pensacola, Florida.

20.     During the investigation to date, I have interviewed several customers of THOMAS INSURANCE to include businesses who purchased commercial policies, as well as individuals who purchased homeowner's and flood insurance policies on their personal residences.  The investigation has identified numerous victims of the fraud who have all described how they paid insurance premiums to THOMAS INSURANCE, but later learned the documents provided to them by THOMAS were fraudulent.  Some of the

10

businesses and individuals have suffered additional damages due to unpaid insurance claims as a result of the fraud.

21.     One of the victims, hereinafter referred to as Victim Company #2, is a real estate rental company located in Pensacola Beach, Florida. Victim Company #2 owns a commercial business property, several condominium rental properties and a bike rental business. I interviewed the owners of Victim Company #2 on February 12, 2021. Victim Company #2 began using THOMAS INSURANCE for the property and flood insurance policies on all of the victim's properties in either 2004 or 2005 after Hurricane Ivan. Based on my investigation to date, Victim Company #2 has paid over $100,000 in premiums to THOMAS INSURANCE between 2014 and 2020.

22.     After Hurricane Sally, which made landfall near Gulf Shores, Alabama, on September 16, 2020, Victim Company #2 suffered significant damage to two of the properties which were insured by THOMAS INSURANCE. Shortly after the storm, the owner of Victim Company #2 contacted THOMAS about filing claims for the damage to the properties. When THOMAS came out to assess the damage, he told the owner the damage was not significant enough to exceed the deductibles on the policies.

11

23.   After meeting with THOMAS, the owner of Victim Company #2 began gathering estimates for the damage.  The damage to one building, a condominium, included damage to the exterior walls and to the balconies and rails.  Due to the structural nature of the damage, Victim Company #2 has not been able to rent the condos to customers since the hurricane.  Victim Company #2's office building also suffered damage from Hurricane Sally.  The building's roof was damaged which resulted in water damage inside the building.   In addition, the exterior balcony on the second floor of the property was damaged, and the owners had to use caution tape to keep people off the balcony and to prevent people from walking under the balcony.

24.   According to the owner of Victim Company #2, the estimates for the repairs for the condominium building damaged by the hurricane exceed $850,000.  The owners have not yet been able to get estimates for the damage to Victim Company #2's office building.   The owners have been sending THOMAS the estimates via email for the repairs as they are received, and THOMAS indicated he was sending the estimates to the insurance carrier, but the owner never heard anything about how the claim would be settled.

25.   The owners of Victim Company #2 became concerned when THOMAS grew increasingly unresponsive to the owners' requests about filing

12

insurance claims related to the hurricane. In February 2021, the owners of Victim Company #2 contacted the insurance carriers directly regarding the policies purchased through THOMAS INSURANCE and were told the policies they purchased did not exist for the two properties described above. Therefore, the owners have no insurance coverage for the hurricane damage to the properties which they anticipate will exceed $1 million.

26.     On February 8, 2021, I interviewed another victim hereinafter referred to as Victim #3 who is an attorney in Pensacola, Florida. Victim #3 owns a commercial warehouse building in Pensacola as well as the building in which Victim #3 operates a law office. Victim #3 has used THOMAS INSURANCE for the commercial property insurance policies for both buildings for approximately seven years. Based on my investigation to date, Victim #3 has paid over $70,000 in insurance premiums to THOMAS INSURANCE between 2014 and 2020.

27.     As a result of Hurricane Sally, Victim #3 suffered damage to the victim's law office building, including roof damage, interior water damage, and damage to the building's awnings. Victim #3 contacted THOMAS regarding the damage to the office building, and THOMAS came to the building to "self-adjust" the damage. THOMAS agreed the building needed a new roof and told

13

the victim he would initiate the claim. Based on THOMAS' instructions, Victim #3 found a contractor to replace the roof and provided the estimate to THOMAS.

28.     By February 2021 when the contractor had begun replacing the roof, Victim #3 had grown concerned by THOMAS' lack of responsiveness on the claim. Victim #3 contacted another insurance agent for advice, and after reviewing the documents THOMAS had provided to the victim, the agent told the victim the policy documents did not appear to be legitimate. Victim #3 then contacted the insurance carriers directly and determined both of the commercial property policies were fraudulent. As a result, Victim #3 estimates the damages to the office building of approximately $150,000 will not be covered.

29.     On February 1, 2021, I interviewed a dermatologist surgeon (hereinafter referred to as Victim #4) who provides services in Pensacola, Florida. Victim #4 has been using THOMAS INSURANCE for the commercial general liability and property insurance policies for Victim #4's surgery practice since 2005.

30.     In January 2021, Victim #4 was complaining to a friend about the difficulty the victim was having when attempting to get in touch with the victim's insurance agent. Once the friend heard THOMAS was the victim's

14

insurance agent, the friend encouraged Victim #4 to look closer at the policies purchased through THOMAS INSURANCE because there were rumors of insurance fraud related to the business. Victim #4 contacted THOMAS and asked THOMAS to provide his policy information because THOMAS had failed to provide it when Victim #4 had previously requested it.

31. When THOMAS did send Victim #4 an evidence of insurance document via e-mail, the victim sent the information provided by THOMAS to another insurance agent to verify. The new insurance agent was able to verify the general liability and property insurance policies Victim #4 had paid for were fake. In fact, the agent noted the policy document THOMAS provided to Victim #4 referenced a different THOMAS INSURANCE customer in the document. Victim #4 paid THOMAS INSURANCE over $200,000 for the general liability and property insurance policies between November 2013 and October 2019.

32. On January 19, 2021, I interviewed the Chief Financial Officer (CFO) of Victim Company #5 which is a privately held commercial real estate firm that acquires properties such as multi-family tenant properties (apartments) and hotel properties across the United States. Victim Company #5 began using THOMAS INSURANCE around 2012 for the company's property and flood

insurance policies for the properties the company owns in the Pensacola area and surrounding region.

33.     In May 2020, there was a fire at one of Victim Company #5's properties in Mobile, Alabama, and the company filed an insurance claim through THOMAS.  When the claim settlement process began dragging on without a resolution, Victim Company #5 asked a Dallas, Texas based insurance company, which handles some of the company's other insurance policies, to look into the policy managed by THOMAS INSURANCE.  The Dallas based insurance company determined the policy purchased through THOMAS INSURANCE was fraudulent, so they began reviewing all the insurance policies purchased through THOMAS INSURANCE.  Based on their research, they determined the majority, if not all, of the insurance policies did not exist.

34.     In or around August 25, 2020, Victim Company #5 received a check directly from THOMAS INSURANCE of approximately $481,000 to settle part of the fire claim.  In or around September 9, 2020, Victim Company #5 received a second check from THOMAS INSURANCE of approximately $409,000, but this second check was rejected by the bank.  On or about September 22, 2020, Victim Company #5's CFO travelled to Pensacola to meet in person with

THOMAS. The CFO confronted THOMAS about what he had learned about the fraudulent insurance policies and THOMAS admitted to the fraud. THOMAS told the CFO that Victim Company #5 was the only customer he defrauded. The CFO agreed to try to settle the matter with THOMAS privately, and THOMAS gave the CFO a cashier's check on that day for approximately $435,000 to cover the outstanding portion of the claim from the check that had bounced.

35. Victim Company #5 provided the FBI with a spreadsheet detailing the insurance policies purchased through THOMAS INSURANCE on the various properties owned by the company. According to this spreadsheet, the insurance premiums paid to THOMAS INSURANCE by Victim Company #5 between 2012 and 2021 exceeded $3 million.

36. On February 5, 2021, I interviewed THOMAS' wife, SHANA THOMAS (hereinafter referred to as SHANA). According to SHANA, in either September or October 2020, THOMAS moved to a residence located at 2001 High Street in Park City, Utah which is a vacation home purchased by THOMAS and SHANA in the summer of 2020. SHANA could not explain what prompted THOMAS to move to Utah, but she denied any knowledge that THOMAS moved due to problems with THOMAS INSURANCE.

37.     SHANA advised during her interview that beginning on or around January 28, 2021, she started receiving calls from friends who were customers of THOMAS INSURANCE.   The customers were complaining to SHANA because they had learned the insurance policies they purchased from THOMAS were fraudulent.   Even though SHANA has a 50% ownership interest in THOMAS INSURANCE, she denied any knowledge of fraud at the company.

38.     According to SHANA, THOMAS handled all the financial records at THOMAS INSURANCE as well as the financial matters for their family. SHANA stated the couple have a joint bank account at Synovus Bank and THOMAS INSURANCE banks at ServisFirst Bank.   According to SHANA, the couple purchased the residence located at 2001 High Street in Park City, Utah for approximately $800,000.   They also purchased a condominium at Portofino in Pensacola Beach for approximately $400,000 about two or three years ago.  SHANA stated both properties were purchased through a trust called JSSK TRUST which stands for the initials of THOMAS, SHANA, and their two daughters.

## JSSK TRUST

39.     I obtained a copy of the Certificate of Trust for The JSSK Family Trust dated October 7, 2014.  The trustees for the trust are listed as JOHN

18

MICHAEL THOMAS and SHANA SHEPPARD THOMAS.  The certificate states the trustees shall hold title to trust property by titling the property in the following manner:  JOHN MICHAEL THOMAS AND SHANA SHEPPARD THOMAS, TRUSTEES OF THE JSSK FAMILY TRUST DATED OCTOBER 7, 2014.

## SERVISFIRST THOMAS INSURANCE ACCOUNT

40.    On April 25, 2016, THOMAS opened a ServisFirst Bank checking account, last four digits 6367, with the following account owner name and address:

> Thomas Insurance, LLC
> 1010 W. Garden St.
> Pensacola, FL  32502

41.    Both JOHN THOMAS and SHANA THOMAS are signers on the account.  The initial deposit into the account was a $5,000 check written on a BBVA Compass Bank account in the name of THOMAS INSURANCE LLC dated May 18, 2016.

## DEPOSITS OF VICTIM CHECKS

42.    I have reviewed the bank records for the THOMAS INSURANCE LLC checking account at ServisFirst Bank ending in 6367.  The bank records show that checks from customers of THOMAS INSURANCE, including checks

19

from all the victims described above for the fraudulent insurance premiums, were regularly deposited into the account. I identified the following examples of deposits of victim checks for fraudulent insurance premiums into the account ending in 6367 on the approximate dates noted:

| Victim | Deposit Date | Amount |
|---|---|---|
| Victim 2 | 8/23/2017 | $4,358.00 |
| Victim 1 | 8/28/2017 | $43,226.00 |
| Victim 3 | 9/14/2017 | $10,966.22 |
| Victim 5 | 9/14/2017 | $39,998.00 |
| Victim 1 | 10/16/2017 | $29,225.00 |
| Victim 4 | 11/21/2017 | $32,978.00 |
| Victim 5 | 12/22/2017 | $42,896.00 |
| Victim 5 | 2/15/2018 | $96,434.00 |
| Victim 5 | 6/11/2018 | $42,000.00 |
| Victim 5 | 7/16/2018 | $74,061.00 |
| Victim 3 | 8/31/2018 | $10,966.22 |
| Victim 1 | 9/11/2018 | $43,226.00 |
| Victim 1 | 10/15/2018 | $30,772.00 |
| Victim 4 | 11/5/2018 | $34,259.00 |
| Victim 5 | 12/27/2018 | $42,896.00 |

| Victim 5 | 6/11/2019 | $66,980.00 |
|---|---|---|
| Victim 3 | 8/1/2019 | $10,966.22 |
| Victim 1 | 8/26/2019 | $44,360.00 |
| Victim 5 | 9/3/2019 | $35,352.00 |
| Victim 5 | 9/3/2019 | $12,136.50 |
| Victim 1 | 10/7/2019 | $37,392.00 |
| Victim 4 | 10/17/2019 | $40,949.00 |
| Victim 5 | 10/16/2019 | $40,600.00 |
| Victim 5 | 10/24/2019 | $35,500.00 |
| Victim 5 | 10/30/2019 | $45,300.00 |
| Victim 5 | 10/30/2019 | $20,500.00 |
| Victim 5 | 10/30/2019 | $52,000.00 |
| Victim 5 | 1/10/2020 | $124,444.00 |
| Victim 5 | 1/10/2020 | $110,356.00 |
| Victim 5 | 2/4/2020 | $85,020.00 |
| Victim 2 | 1/30/2020 | $18,397.94 |
| Victim 5 | 2/26/2020 | $98,863.00 |
| Victim 3 | 8/17/2020 | $11,285.00 |
| Victim 1 | 10/20/2020 | $52,923.00 |
| Victim 1 | 11/23/2020 | $50,237.00 |

| Victim 2 | 12/8/2020 | $6,790.00 |
|---|---|---|
| | **Total** | **$1,578,613.10** |

## SERVISFIRST JSSK TRUST ACCOUNT

43.    On May 13, 2016, THOMAS opened a ServisFirst Bank checking account, last four digits 6433, with the following account owner name and address:

> JSSK Family Trust DTD 10-7-14
> By John Michael Thomas and
> Shana Sheppard Thomas as Co-Trustees
> 289 Plantation Hill Rd.
> Gulf Breeze, FL  32561

44.    Both JOHN THOMAS and SHANA THOMAS are signers on the account.  The initial deposit into the account was a $5,000 check written on a BBVA Compass Bank account in the name of THOMAS INSURANCE LLC dated May 18, 2016.   Detailed below are the transactions related to the purchases of the Defendant Real Properties.

45.    The beginning balance on February 1, 2019, in the ServisFirst Bank account for the JSSK Family Trust ending in 6433 was $5,194.81.  There were two deposits during the month of February 2019, including a telephone transfer on February 26, 2019, in the amount of $278,730.14 from the ServisFirst Bank

checking account of THOMAS INSURANCE LLC ending in 6367. The other deposit into the account ending in 6433 was a telephone transfer on February 26, 2019, in the amount of $160,000 from a ServisFirst Bank account ending in 9635.    On February 26, 2019, THOMAS transferred the total of these two deposits to Allure Title Company, LLC. The memo for the wire transfer noted "5 Portofino Drive, Unit #1006."

46.    On May 1, 2020, the ServisFirst Bank account for the JSSK Family Trust ending in 6433 had a balance of $40,044.89. There was one deposit during the month of May 2020 in the amount of $344,744.41. This deposit was made up of two wire transfers: the first was a transfer on May 20, 2020 in the amount of $144,744.41 from the ServisFirst Bank checking account of THOMAS INSURANCE LLC ending in 6367. The other deposit into the account ending in 6433 was a transfer on May 20, 2020 in the amount of $200,000 from a ServisFirst Bank account ending in 9635.

47.    The ServisFirst Bank account records also show a wire transfer from the JSSK Family Trust account ending in 6433 was sent on May 20, 2020, in the amount of $344,744.41 to US Title Insurance Agency Park City Escrow Trust Account at Grand Valley Bank.

## SERVISFIRST HOME EQUITY LINE OF CREDIT

48.     On February 9, 2017, JOHN and SHANA THOMAS took out a home equity line of credit (HELOC) in the amount of $200,000 from ServisFirst Bank.  The last four digits of the account number for the HELOC are 9635.  The HELOC was secured by THOMAS' personal residence located at 289 Plantation Hill Road, Gulf Breeze, Florida.

49.     After the transfer of $160,000 from the HELOC account ending in 9635 to the JSSK Family Trust account ending in 6433 on February 26, 2019, the following payments were made to the HELOC account on the dates noted:

| Date | Amount | Account Name | Bank |
|------|--------|--------------|------|
| 3/26/19 | $569.86 | Thomas Insurance LLC | Coastal Bank & Trust |
| 4/19/19 | $797.81 | Thomas Insurance LLC | Coastal Bank & Trust |
| 5/28/19 | $883.28 | Thomas Insurance LLC | Coastal Bank & Trust |
| 6/17/19 | $60,911.78 | Thomas Insurance LLC | ServisFirst Acct - 6367 |
| 7/26/19 | $509.32 | Thomas Insurance LLC | Coastal Bank & Trust |

| 8/28/19 | $560.27 | Thomas Insurance LLC | Coastal Bank & Trust |
|---------|---------|---------|---------|
| 9/16/19 | $25,530.83 | Thomas Insurance LLC | ServisFirst Acct -6367 |
| 10/24/19 | $75,376.02 | Thomas Insurance LLC | ServisFirst Acct -6367 |
| Total | $165,139.17 | | |

50.     After the transfer of $200,000 on May 20, 2020 from the HELOC account ending in 9635 to the JSSK Family Trust account ending in 6433, THOMAS made a payment to the HELOC on check number 2597 dated June 29, 2020 in the amount of $200,627.04 from the ServisFirst Bank checking account of THOMAS INSURANCE LLC ending in 6367.

## SYNOVUS BANK ACCOUNT

51.     On March 29, 2017, JOHN and SHANA THOMAS opened a personal checking account at Synovus Bank ending in 1492.   Both JOHN THOMAS and SHANA THOMAS are signers on the account.

52.     On May 21, 2020, the checking account at Synovus Bank ending in 1492 received a wire transfer from a ServiceLink NLS, LLC Pennsylvania Origination Escrow Trust account at Citibank in the amount of $500,000.  Shana

Thomas and John Thomas are listed as the beneficiaries of the trust account on the wire transfer.

53.     As of the date of this affidavit, I have not obtained the records for the ServiceLink NLS account to determine to source of the $500,000 wire transfer or how it was funded.   My investigation is continuing regarding the source of these funds.

## PURCHASE OF PORTOFINO PROPERTY

54.     Records obtained from the Escambia County Property Appraiser's website reveal that on or about February 27, 2019, the JSSK Family Trust dated October 7, 2014, purchased the Portofino Property for $445,000.   Allure Title Company served as the title agent for the closing.

55.     A review of the ServisFirst Bank records reveals on January 31, 2019, THOMAS issued check number 2551 to Allure Title Company in the amount of $5,000 from the THOMAS INSURANCE bank account ending in 6367 at ServisFirst Bank.   The memo section of the check reads "Escrow Deposit."

56.     On February 26, 2019, THOMAS transferred $438,730.14 from the ServisFirst Bank account ending in 6433 in the name of the JSSK Family Trust

to Allure Title Company, LLC's Regions Bank account. The memo for the wire transfer noted "5 Portofino Drive, Unit #1006."

57.     Based on the transactions detailed above, nearly all of the funds used to purchase the Portofino Property originated from or were funded by the ServisFirst Bank account ending in 6367, which is the account where THOMAS deposited checks from the victims. (*See* paragraph 42.) The $160,000 transferred to the JSSK Family Trust account ending in 6433 at ServisFirst Bank from the HELOC at ServisFirst Bank was repaid with funds from the THOMAS INSURANCE account ending in 6367, with the exception of approximately $3,320 from a THOMAS INSURANCE Coastal Bank & Trust account. (*See* paragraph 49.)

58.     Since the Portofino Property was purchased with at least $440,409 in proceeds from a violation of 18 U.S.C. Section 1343 (wire fraud), the real property is subject to forfeiture as proceeds of the wire fraud violations, pursuant to Title 18, United States Code, Section 981(a)(1)(C). The wire transfers detailed above violated Title 18, United States Code, Section 1957(a) because the payments involved monetary transactions conducted with more than $10,000 in criminally derived funds and, as such, the entire real property is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

## PURCHASE OF CANYON CROSSING PROPERTY

59.     Records obtained from the Summit County Property Appraiser's website reveal that on or about May 22, 2020, John Michael Thomas and Shana Sheppard Thomas as Trustees of the JSSK Family Trust dated October 7, 2014, purchased the Canyon Crossing Property.

60.     I obtained a copy of the Warranty Deed from the May 22, 2020 purchase of the Canyon Crossing Property which shows US Title Insurance Agency served as the title agent for the closing.  I also obtained a copy of the final HUD Statement from the title agent which shows the purchase price for the Canyon Crossing Property was $885,000.  The HUD Statement further shows the purchasers made a deposit of $40,000.

61.     I have reviewed a copy of the confirmation of the receipt of earnest money from the title company which shows John Michael Thomas and Shana Sheppard Thomas provided their earnest money in the amount of $40,000 via a direct wire transfer on April 6, 2020 to the authorized brokerage representative at Summit Sotheby's International Realty – Park City.  Bank records from the THOMAS INSURANCE LLC account at ServisFirst Bank ending in 6367 show a wire transfer on April 6, 2020 of $40,000 to Summit Sothebys International Realty Trust Account at Zions Bank.  The reference on the bank

28

statement for the wire transfer reads "THOMAS 2001 HIGH STREET DEPOSI." I believe this is meant to refer to the "deposit" sent by THOMAS for the earnest money on the purchase of the Canyon Crossing Property located at 2001 High Street, Park City, UT.

62. On May 21, 2020, THOMAS transferred $500,000 from the Synovus Bank account ending in 1492 in the name of John and Shana Thomas to the US Title Insurance Agency Park City Escrow Trust Account. This transfer combined with the May 20, 2020 transfer of $344,744.41 described above make up the $844,744.41 due from the Buyer on the final HUD statement for the Canyon Crossing Property.

63. Based on the transactions detailed above, at least $384,744.41 of the funds used to purchase the Canyon Crossing Property originated from or were funded by the ServisFirst Bank account ending in 6367, which is the account where THOMAS deposited checks from the victims. (*See* paragraph 42.) The investigation continues with respect to the source of the $500,000 used to purchase the Canyon Crossing Property, but at least 43% of the funds used to purchase the property were from proceeds of the scheme described above.

64. Since the Canyon Crossing Property was purchased with at least $384,744.41 in proceeds from a violation of 18 U.S.C. Section 1343 (wire fraud),

29

the real property is subject to forfeiture as proceeds of the wire fraud violations, pursuant to Title 18, United States Code, Section 981(a)(1)(C).   The wire transfers detailed above violated Title 18, United States Code, Section 1957(a) because the payments involved monetary transactions conducted with more than $10,000 in criminally derived funds and, as such, the entire real property is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

## STATUTES

65.   Under 18 U.S.C. § 1343, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than twenty years, or both."

66.   Title 18, United States Code, Section 1956 provides that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity – and knowing that the transaction is designed in whole or in

part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than 20 years, or both.

67.   Title 18, United States Code, Section 1957 provides that "whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished by fine or imprisonment for not more than ten years or both."

68.   Title 18, United States Code, Section 981(a)(1)(A) provides that "any property, real or personal, involved in a transaction in violation of section 1956, 1957 . . . or any property traceable to such property is subject to forfeiture."

69.   Title 18, United States Code, Section 981(a)(1)(C) provides that any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title, or a conspiracy to commit such offense, is subject to forfeiture).

31

70.     Title 18, United States Code, Section 1956(c)(7) establishes that the term "specified unlawful activity" means – "(A) any act of activity constituting an offense listed in section 1961(1) of this title. . . ."

71.     Title 18, United States Code, Section 1961(1) sets forth numerous offenses including section 1343 (relating to wire fraud).

72.     Title 18, United States Code, Section 981(a)(1)(A) provides for the civil forfeiture of any property, real or personal, involved in a transaction in violation of section 1956 and 1957, or traceable to such property; and that Title 18, United States Code, Section 981(a)(1)(C) provides that any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of … any offense constituting "specified unlawful activity" (here, Section 1343 relating to wire fraud) is subject to civil forfeiture.

## CONCLUSION

73.     I submit this affidavit sets forth sufficient facts to establish that the Defendant Real Properties are involved in transactions or constitute proceeds or are derived from proceeds traceable to, violations of Title 18, United States Code, Sections 1343, 1956, and 1957, or the attempt thereof.  As such, the

32

Defendant Real Properties are subject to forfeiture, pursuant to Sections 981(a)(1)(A) and 981(a)(1)(C).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Jennifer W. Joiner
Special Agent
Federal Bureau of Investigation

**STATE OF FLORIDA
COUNTY OF ESCAMBIA**

The foregoing was sworn before me this 5th day of March, 2021, by Jennifer W. Joiner, who is personally known to me or has produced Creds. as identification.

Karen M. Bird
**Notary Public**

My Commission Expires:   September 20, 2022



KAREN M. BIRD
Commission # GG 248148
Expires September 20, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

33